Jennifer Kroll (AZ#019859)
**MARTIN & BONNETT PLLC**
4647 N. 32nd Street, Suite 185
Phoenix, AZ 85018
Telephone: (602) 240-6900
Facsimile: (602) 240-2345
jkroll@martinbonnett.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| John Clemens, derivatively on behalf of Leslie's, Inc., | |
| Plaintiff, | Case No. |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Michael R. Egeck; Steven M. Weddell; Yolanda Daniel; Eric Kufel; Jodeen Kozlak; Marc Magliacano; Susan O'Farrell; Steven L. Ortega; James Ray, Jr.; Claire Spofford; and John Strain, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| Leslie's, Inc., | |
| Nominal Defendant. | |

**INTRODUCTION**

Plaintiff John Clemens ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Leslie's, Inc. ("Leslie's" or the "Company"), files this Verified Shareholder Derivative Complaint against Michael R. Egeck ("Egeck"), Steven M. Weddell ("Weddell"), Yolanda Daniel ("Daniel"), Eric Kufel ("Kufel"), Jodeen Kozlak ("Kozlak"), Marc Magliacano ("Magliacano"), Susan O'Farrell ("O'Farrell"), Steven L. Ortega ("Ortega"), James Ray, Jr. ("Ray"), Claire Spofford ("Spofford"), and John Strain ("Strain") (collectively, the "Individual Defendants," and together with Leslie's, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Leslie's, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and against Defendants Egeck and Weddell for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Leslie's, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Leslie's directors and officers from February 3, 2022 through July 13, 2023, both dates inclusive (the "Relevant Period").

2.      Leslie's is a Delaware corporation based in Phoenix, Arizona. Leslie's describes itself as "the largest direct-to-consumer brand in the U.S. pool and spa care industry, serving residential, professional, and commercial consumers." Leslie's has more than 950 store locations which sell a wide range of supplies for swimming pool maintenance and use, including chemicals, cleaning products, equipment, and parts, in addition to hot tub spa supplies and patio furniture.

3.      Of Leslie's wide variety of product offerings, about eighty percent are "non-discretionary" products necessary for the functioning of swimming pools and spas, including chemicals, pool equipment, cleaning products, and pool parts.

4.      According to the Company's public filings, due to the "non-discretionary nature" of Leslie's products and services, Leslie's has enjoyed "strong, uninterrupted growth and profitability in all market environments." Additionally, as a swimming pool supplies company, Leslie's product sales are largely seasonal and predictable; approximately seventy-five percent of the Company's sales are achieved between April and September, which constitute the second half of the fiscal year for Leslie's.[1] Indeed,

---

[1] Leslie's fiscal year ends on the closest Saturday to September 30th of each calendar year.

Leslie's maintains that since swimming pool owners have no choice but to continue to maintain their pools by using "non-discretionary" chemicals, equipment, and parts, the Company enjoys an "annuity-like stream of demand" for those chemicals and products which creates a "highly predictable, recurring revenue model[.]" Moreover, since Leslie's founding in 1963, the Company grew sales for fifty-nine years in a row, until 2022.

5.     Leslie's initially went public in 1991 via an initial public offering ("IPO"), raising $28 million. The Company used the funds raised from the IPO to expand its business by adding hundreds of stores to its portfolio throughout the 1990s. In 1997, Leslie's was taken private by Hancock Park Associates and Leonard Green Partners L.P., a private equity firm based out of Los Angeles, after the Company's stock experienced significant volatility.[2] The Company was later purchased by L Catterton, another private equity firm, in 2017.

6.     Approximately three years later, on October 29, 2020, Leslie's went public again, riding on the success the swimming pool industry experienced during the COVID-19 pandemic, which brought about consumer interest in home activities such as enjoying residential swimming pools and home spas.

7.     Soon after Leslie's 2020 IPO, a chlorine-based chemical tablet product named Trichlor, a necessity for swimming pool maintenance, almost doubled in price due

---

Therefore, for the fiscal years of 2022, 2021, and 2020, Leslie's fiscal years ended on October 1, 2022, October 2, 2021, and October 3, 2020.

[2] Jill Leovy, "Leslie's Poolmart Agrees to Deal Taking It Private," *Los Angeles Times*, Feb. 28, 1997, https://www.latimes.com/archives/la-xpm-1997-02-28-fi-33319-story.html.

to supply chain issues arising from the COVID-19 pandemic and an August 2020 fire at

BioLab in Lake Charles, Louisiana, one of the primary chlorine plants in the United States.[3]

8.      Leslie's quickly used the chemical shortage to boost business by spurring

consumer demand for its products. In the first quarter of Leslie's fiscal year 2022 (the

"2022 Fiscal Year"), the Company sent letters to a sizable portion of its customers. The

letters stated that Leslie's could not "guarantee product availability" and that customers

should purchase products while Leslie's had them in stock. Based on these representations,

many of Leslie's customers purchased excessive amounts of pool chemical products in

stockpile fashion to avoid the chance of facing unavailability of chemical products in the

future. However, at the same time, the Individual Defendants told investors that Leslie's

enjoyed "very durable" and "recurring demand" for its products, and that the Individual

Defendants "just haven't seen any indication of any meaningful pull-forward" customer

buying activity.

9.      During the Relevant Period, the Company repeatedly touted strong sales

increases and full year guidance in its press releases and earnings conference calls with

investors. For instance, on February 5, 2021, the first day of the Relevant Period, Leslie's

reported in a press release that the Company's sales increased 17.9% to $145.0 million

when compared to the first quarter of 2020. During an earnings call with investors that

same day, Defendant Egeck attributed Leslie's success to "our ability to both serve our

---

[3] Ron Hurtibise, "Trouble finding chlorine for your pool? Blame last summer's fire at Lake Charles plant," *South Florida Sun Sentinel*, May 3, 2021, https://www.nola.com/news/business/trouble-finding-chlorine-for-your-pool-blame-last-summers-fire-at-lake-charles-plant/article_242e669a-ac13-11eb-9b78-6ff935201675.html.

existing consumers as well as a significant number of new consumers we are acquiring with our growth strategies." He also stated that Leslie's "will have supply of products that other retailers don't."

10. The Individual Defendants continued this refrain depicting "healthy ongoing consumer demand" and "durable demand" driven by "strategic growth initiatives" in press releases and earnings calls in remarkably similar fashion throughout 2021, 2022, and well into 2023. When sales decreased between February and May 2023, the Individual Defendants attributed the slowdowns to poor weather conditions and the "seasonal purchasing cycle" of customers. Nevertheless, the Individual Defendants maintained Leslie's financial guidance for the fiscal year ended September 30, 2023 (the "2023 Fiscal Year").

11. However, unknown to investors and the public, due to customers overbuying and hoarding pool products in 2021 and 2022, Leslie's third quarter of 2023 financial results would fall significantly below what the Company had forecasted, and not because of weather conditions or the seasonality of the pool supply business.

12. The truth emerged on July 13, 2023, after the market closed, when Leslie's announced through a press release preliminary financial results for the third quarter of 2023, which concluded on July 1, 2023. The results indicated that Leslie's third quarter sales would be $611 million, or 9% less year-over-year. The press release also stated that gross profits were anticipated to drop almost 18% to somewhere between $249 to $250 million. In the same vein, gross margins would be 41% after dropping 410 basis points when compared to the previous year, while adjusted EBITDA for the third quarter of 2023

was anticipated to fall more than 30% to somewhere between $124 to $128 million. The press release further indicated that Leslie's would have to reduce its 2023 Fiscal Year forecast including net sales to between $1,430 to $1,450 million, down from a range of $1,560 to $1,640 million; gross profits to between $549 to $559 million, down from $667 million to $708 million; and adjusted EBITDA to between $170 to $180 million, down from $280 to $310 million.

13.     The press release blamed these lackluster sales figures on "consumers [having] entered the pool season with a greater than normal amount of chemicals [] left over from last year."

14.     The press release also revealed that Defendant Weddell would be leaving his role as Leslie's Chief Financial Officer ("CFO"), effective August 7, 2023, and that he would be replaced by Scott Bowman. In connection with this agreement, Defendant Weddell remains with Leslie's as an advisor until December 31, 2023.

15.     On this news, the Company's stock price plummeted $2.82 per share, or 29%, from closing at $9.52 per share on July 13, 2023, to closing at $6.70 per share on July 14, 2023. The Company's stock price fell another $1.24 per share, or 18%, the following trading day, to close at $5.46 per share on July 17, 2023.

16.     Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, financial success, and growth. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage

due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's customers purchased more pool chemicals than needed during and after the COVID-19 pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by artificial demand from a feared product shortage; (4) the Company concealed the true cause of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result, the Company's public statements depicting Leslie's growth as "durable," "show[ing] no signs of slowing," and being based upon "healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company  was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while several of the Individual Defendants engaged in improper insider sales, netting personal proceeds exceeding $95 million.

19.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, the Individual Defendants caused Leslie's to repurchase approximately 7.5 million shares of the Company's common stock at artificially inflated prices on December 16, 2022 for over $151 million. As the Company's common stock was actually worth only $5.46 per share, the price at which it was trading when the truth emerged on July 17, 2023, the Company overpaid approximately $111 million in total for repurchases of its own stock during the Relevant Period.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its former CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Arizona (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Egeck's and Defendant Weddell's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, their causing the Company to make the repurchases alleged herein, and their not being disinterested and/or independent directors, a majority of Leslie's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Leslie's is headquartered in this District. Moreover, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

**Plaintiff**

26.     Plaintiff is a current shareholder of Leslie's. Plaintiff has continuously held Leslie's common stock since he purchased it on April 27, 2021.

**Nominal Defendant Leslie's**

27.     Nominal Defendant Leslie's is a Delaware corporation with its principal executive offices located at 2005 East Indian School Road, Phoenix, Arizona 85016. Leslie's shares trade on the NASDAQ GS under the ticker symbol "LESL."

**Defendant Egeck**

28.     Defendant Egeck has served as the Company's CEO and as a director since February 2020. According to the Company's proxy statement filed on Schedule 14A with the SEC on January 27, 2023 (the "2023 Proxy Statement"), as of December 31, 2022, Defendant Egeck beneficially owned 3,015,259 shares of the Company's common stock, representing 1.6% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Egeck beneficially owned approximately $36.8 million worth of Leslie's stock as of that date.

29.     For the fiscal year ended October 2, 2021 (the "2021 Fiscal Year"), Defendant Egeck received $7,911,515 in total compensation from the Company. This included $1,023,077 in salary, $550,000 in bonuses, $4,803,926 in stock options, and $1,534,512 in non-equity incentive plan compensation. For the fiscal year ended October 1, 2022 (the "2022 Fiscal Year"), Defendant Egeck received $3,339,438 in total compensation from the Company. This included $1,025,000 in salary, $1,547,063 in stock options, $761,575 in non-equity incentive plan compensation, and $5,800 in all other compensation.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Egeck made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| February 16, 2021 | 762,135 | $25.22 | $19,221,044 |
| June 14, 2021 | 475,658 | $26.81 | $12,752,390 |

Thus, in total, before the fraud was exposed, he sold 1,237,793 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $31,973,434 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.     The Company's 2023 Proxy Statement stated the following about Defendant Egeck:

> Mr. Egeck is our Chief Executive Officer and a member of our Board. Mr. Egeck joined in such capacities in February 2020. Previously, Mr. Egeck

served as the Chief Executive Officer of PSEB Group, a $1.5 billion operating company composed of the Eddie Bauer outdoor brand and teen retailer PACSUN. Mr. Egeck has more than three decades of experience and a proven track record of driving transformational growth for a variety of brands and business models including: Chief Executive Officer of Eddie Bauer (from 2012 to 2020); Chief Executive Officer of Hurley International, a division of Nike, Inc. (from 2011 to 2012); President of True Religion Apparel, Inc. (from 2010 to 2011); President of VF Corp's Contemporary Brand Coalition (from 2007 to 2009); Chief Executive Officer of Seven For All Mankind, prior to its acquisition by VF Corp. (from 2006 to 2007); President of VF Corp's Outdoor and Action Sports Coalition (from 2004 to 2006); and President of The North Face, a division of VF Corp (from 2000 to 2004). Previously, Mr. Egeck held senior leadership positions at Columbia Sportswear and Seattle Pacific Industries. Mr. Egeck has a B.A. in Economics from the University of Washington and an M.B.A. from the Michael G. Foster School of Business at the University of Washington. Mr. Egeck was selected to serve on our Board because of his experience and knowledge of the consumer industry, including as our Chief Executive Officer.

**Defendant Weddell**

32.     Defendant Weddell served as the Company's CFO from June 2015 until he stepped down from his position effective August 7, 2023. From August 7, 2023 until December 31, 2023, he served as a special advisor to the Company. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Weddell beneficially owned 1,779,024 shares of the Company's common stock, representing 1.0% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Weddell beneficially owned approximately $21.7 million worth of Leslie's stock as of that date.

33.     For the 2021 Fiscal Year, Defendant Weddell received $4,959,085 in total compensation from the Company. This included $560,769 in salary, $550,000 in bonuses, $3,002,451 in stock options, $840,165 in non-equity incentive plan compensation, and

$5,700 in all other compensation. For the 2022 Fiscal Year, Defendant Weddell received $1,966,230 in total compensation from the Company. This included $570,000 in salary, $966,920 in stock options, $423,510 in non-equity incentive plan compensation, and $5,800 in all other compensation.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Weddell made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| February 16, 2021 | 540,094 | $25.22 | $13,621,170 |
| April 22, 2021 | 103,543 | $25.82 | $2,673,480 |

Thus, in total, before the fraud was exposed, he sold 643,637 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $16,294,650 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.     The Company's 2023 Proxy Statement stated the following about Defendant Weddell:

**Steven M. Weddell** is our Executive Vice President, Chief Financial Officer and Treasurer. Mr. Weddell joined the Company in such capacities in June 2015. Mr. Weddell served as a member of our Board from March 2016 to October 2020. Mr. Weddell worked at Goldman, Sachs & Co. from 2003 to 2015, in the Investment Banking Group, and served as a Managing Director in the Consumer Retail Group as well as the Merger Leadership Group. Mr. Weddell also served as a Manager in the Assurance Practice at Arthur Andersen LLP. Mr. Weddell earned his CPA license in California and previously held Series 7 and Series 24 licenses. Mr. Weddell has a B.S. in

Accounting from the University of Southern California and an M.B.A. from the Wharton School of Business at the University of Pennsylvania.

**Defendant Daniel**

36.     Defendant Daniel has served as a Company director since October 2020. She also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Daniel beneficially owned 9,560 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Daniel beneficially owned approximately $116,728 worth of Leslie's stock as of that date.

37.     For the 2021 Fiscal Year, Defendant Daniel received $198,333 in total compensation from the Company. This included $73,333 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant Daniel received $251,886 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $171,886 in stock awards.

38.     The Company's 2023 Proxy Statement stated the following about Defendant Daniel:

> **Ms. Daniel** joined the Board in October 2020. Ms. Daniel is the former Vice President, Finance of the Federal Reserve Bank of Chicago where between 2017 through 2022 she was responsible for finance, financial analytics, procurement and supplier diversity. The Federal Reserve Bank of Chicago is one of twelve regional reserve banks that, along with the Federal Reserve Board of Governors, make up the United States central bank. Ms. Daniel brings 30 years of finance, accounting and audit experience and executive leadership in the global and domestic distribution, financial services, and healthcare industries. Ms. Daniel previously served as CFO for mission-based organizations from 2015 to 2017, which included her tenures at IFF, a community development financial institution and real estate developer,

15

where she led the finance and investor relations functions, as well as tenure at the American Board of Medical Specialties. In the preceding 15 years, Ms. Daniel held senior financial executive roles in industry which included a seven-year tenure at W. W. Grainger, Inc. as Global Chief Audit Executive, CFO and Board Director for Grainger Canada, a division of W.W. Grainger, Inc., and Vice President for finance transformation and, U.S. financial services, where she led the company's U.S. payment operations. Ms. Daniel also held roles of increasing responsibility at CVS Health (formerly Caremark), where, as Vice President, internal audit services she was responsible for attestation and consultation activities during a highly acquisitive and extensive growth period for the company. Ms. Daniel began her finance career in public accounting in 1990 with Banks, Finley, White & Company leaving in 1994 to assume progressive roles in finance leadership with private equity and small businesses. Ms. Daniel earned an MBA from Kellogg School of Management at Northwestern University, B.S. in accounting from the University of Alabama at Birmingham, and is a marketing alumna from Jackson State University. Ms. Daniel is actively engaged in non-profit leadership, is an Aspen Institute 2017 Finance Leaders Fellow, and a member of the Aspen Global Leadership Network. Ms. Daniel was selected to serve on our Board because of her significant experience in finance and accounting, as well as her audit leadership for global and US-based operations across the distribution, financial services, and healthcare industries.

**Defendant Kufel**

39.     Defendant Kufel has served as a Company director since January 2018. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Kufel beneficially owned 80,645 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Kufel beneficially owned approximately $984,675 worth of Leslie's stock as of that date.

40.     For the 2021 Fiscal Year, Defendant Kufel received $456,099 in total compensation from the Company. This included $68,049 in fees earned or paid in cash, $125,000 in stock awards, and $263,050 in all other compensation. For the 2022 Fiscal

Year, Defendant Kufel received $237,202 in total compensation from the Company. This included $65,316 in fees earned or paid in cash and $171,886 in stock awards.

41.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kufel made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| February 16, 2021 | 14,432 | $25.22 | $363,975 |
| June 14, 2021 | 10,893 | $26.81 | $292,041 |
| June 29, 2021 | 645 | $26.81 | $17,292 |

Thus, in total, before the fraud was exposed, he sold 25,970 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $673,308 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2023 Proxy Statement stated the following about Defendant Kufel:

**Mr. Kufel** joined the Board in January 2018 and served as our Executive Chairman from January 2019 through September 2019. Mr. Kufel is the former Chief Executive Officer of West Marine, Inc., a retailer of boating and fishing supplies, and held such role from August 2021 through December 2022. Previously, Mr. Kufel served as Chairman of CorePower Yoga from 2016 to 2020 and as its Chief Executive Officer from 2016 to 2019. From 2015 to 2016, Mr. Kufel was an Operating Partner at *L* Catterton and served on the board of Ferrara Candy Company. Mr. Kufel also served as a Director and the Chief Executive Officer of Van's Foods from 2009 to 2014 and Inventure Foods, Inc. from 1997 to 2008. Mr. Kufel has a Bachelor of Business Administration Degree from Gonzaga University and a master's degree from the Thunderbird School of Global Management. Mr. Kufel was

selected to serve as a director due to his extensive experience in leadership roles in the consumer industry.

**Defendant Kozlak**

43.     Defendant Kozlak served as a Company director from October 2020 until March 16, 2023. She also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Kozlak beneficially owned 9,560 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Kozlak beneficially owned approximately $116,728 worth of Leslie's stock as of that date.

44.     For the 2021 Fiscal Year, Defendant Kozlak received $197,784 in total compensation from the Company. This included $72,784 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant Kozlak received $256,886 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $171,886 in stock awards.

45.     The Company's proxy statement filed on Schedule 14A with the SEC on January 31, 2022 (the "2022 Proxy Statement") stated the following about Defendant Kozlak:

> **Ms. Kozlak** joined the Board in October 2020. Ms. Kozlak is the founder of Kozlak Capital Partners, LLC, a private consulting firm, and has served as its CEO since 2017. Ms. Kozlak previously served as the Global Senior Vice President of Human Resources of Alibaba Group, a multinational conglomerate (2016-2017). Ms. Kozlak also previously served as the Executive Vice President and Chief Human Resources Officer of Target Corporation, one of the largest retailers in the U.S. (2007-2016), and held other senior leadership roles in her 15-year career there. Prior to joining Target Corporation, Ms. Kozlak was a partner in a private law practice and

began her career at Arthur Andersen & Co. Ms. Kozlak also serves on the board of directors of C.H. Robinson Worldwide Inc. (Nasdaq: CHRW), MGIC Investment Corporation (NYSE: MTG) and KB Home (NYSE: KBH). Ms. Kozlak brings to the Board significant executive management and public board experience. Ms. Kozlak also has developed significant knowledge and expertise in the area of human capital development and she has a deep understanding of executive compensation within a public company.

**Defendant Magliacano**

46.     Defendant Magliacano served as a Company director from February 2017 until he resigned on March 16, 2023. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Magliacano beneficially owned 9,560 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Magliacano beneficially owned approximately $116,728 worth of Leslie's stock as of that date.

47.     For the 2021 Fiscal Year, Defendant Magliacano received $193,750 in total compensation from the Company. This included $68,750 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant Magliacano received $237,518 in total compensation from the Company. This included $65,632 in fees earned or paid in cash and $171,886 in stock awards.

48.     The Company's 2022 Proxy Statement stated the following about Defendant Magliacano:

**Mr. Magliacano** joined the Board in February 2017. Mr. Magliacano currently serves as a Managing Partner for *L* Catterton's Flagship Buyout Fund. *L* Catterton is the world's largest consumer-focused private equity firm, with approximately $20 billion of equity capital across seven fund strategies in 17 offices globally. Mr. Magliacano has been a senior investment professional at *L* Catterton since May 2006. Prior to joining *L* Catterton, from 1999 to 2006, Mr. Magliacano was a Principal at

19

North Castle Partners, a private equity firm focused on making consumer growth investments that benefit from healthy living and aging trends. While at North Castle, Mr. Magliacano originated and executed investments in the consumer health and wellness sectors. Prior to joining North Castle, Mr. Magliacano worked at NMS Capital, the merchant bank of NationsBanc Montgomery Securities, making growth investments in early stage consumer and retail businesses. Mr. Magliacano has served on the boards of directors of a variety of private and public companies, including Restoration Hardware. Mr. Magliacano received a BS in Economics from the University of Pennsylvania's Wharton School of Business with dual degrees in Finance and Operations and Information Management and received an MBA from Columbia Business School. He currently serves on the board of directors of OneSpaWorld Holdings Ltd. (NASDAQ: OSW). Mr. Magliacano was selected to serve as a director due to his prior experience on a variety of private and public company boards.

**Defendant O'Farrell**

49.     Defendant O'Farrell has served as a Company director since October 2020. She also serves as the Chair of the Audit Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant O'Farrell beneficially owned 9,560 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant O'Farrell beneficially owned approximately $116,728 worth of Leslie's stock as of that date.

50.     For the 2021 Fiscal Year, Defendant O'Farrell received $202,917 in total compensation from the Company. This included $77,917 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant O'Farrell received $268,735 in total compensation from the Company. This included $87,720 in fees earned or paid in cash, $171,886 in stock awards, and $9,130 in all other compensation.

51.     The Company's 2023 Proxy Statement stated the following about Defendant O'Farrell:

**Ms. O'Farrell** joined the Board in October 2020. Previously, Ms. O'Farrell served as Chief Financial Officer, Senior Vice President, Principal Accounting Officer and Treasurer at BlueLinx Holdings Inc., a wholesale distributor of building and industrial products, from 2014 to 2020. Ms. O'Farrell has been a senior financial executive holding several roles with The Home Depot, a home improvement retailer, from 1999 to 2014. As the Vice President of Finance at The Home Depot, Ms. O'Farrell led teams supporting the retail organization. In her final role with The Home Depot, Ms. O'Farrell was responsible for the finance function for The Home Depot's At Home Services Group. Ms. O'Farrell began her career with Andersen Consulting, LLP, leaving as an Associate Partner in 1996 for a strategic information systems role with AGL Resources. Ms. O'Farrell served as a Director of BlueLinx Corporation, a subsidiary of BlueLinx Holdings. Ms. O'Farrell has a B.S. in business administration from Auburn University. Ms. O'Farrell was selected to serve as a director due to her extensive leadership experience in the retail and distribution industry, her broad business background, financial expertise as well as her experience as the Chief Financial Officer of a publicly listed company.

**Defendant Ortega**

52. Defendant Ortega has served as the Chairman of the Board since 2020. He previously served as the Company's CEO and President from 2017 to 2020, Chief Operating Officer ("COO") and President from 2015 to 2017, CFO and COO from 2014 to 2015, and Executive Vice President ("EVP") and CFO from 2005 to 2015. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Ortega beneficially owned 2,306,604 shares of the Company's common stock, representing 1.3% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Ortega beneficially owned approximately $28.1 million worth of Leslie's stock as of that date.

53. For the 2021 Fiscal Year, Defendant Ortega received $3,989,352 in total compensation from the Company. This included $82,387 in salary, $600,495 in stock

options, and $3,306,470 in all other compensation. For the 2022 Fiscal Year, Defendant Ortega received $500,185 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $365,270 in stock awards, and $9,915 in all other compensation.

54.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ortega made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| February 16, 2021 | 823,104 | $25.22 | $20,758,682 |
| April 22, 2021 | 115,566 | $25.82 | $2,983,914 |
| June 1, 2021 | 38,859 | $29.04 | $1,128,465 |
| June 2, 2021 | 67,516 | $29.11 | $1,965,390 |
| June 3, 2021 | 13,212 | $30.08 | $397,416 |
| June 14, 2021 | 703,616 | $26.81 | $18,863,944 |

Thus, in total, before the fraud was exposed, he sold 1,761,873 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $46,097,811 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's 2023 Proxy Statement stated the following about Defendant Ortega:

> **Mr. Ortega's** prior roles at the Company include Chief Executive Officer and President from 2017 to 2020, President and Chief Operating Officer from 2015 to 2017, Chief Financial Officer and Chief Operating Officer from 2014

to 2015, and EVP and Chief Financial Officer from 2005 to 2014. Prior to joining the Leslie's organization, Mr. Ortega served as Executive Vice President and Chief Financial Officer for BI-LO, LLC from 1999 to 2005. At that time, BI-LO, LLC, was a $4.8 billion leading multi-branded regional supermarket chain in the southeast United States, which operated 423 stores in six states. Mr. Ortega's responsibilities at BI-LO, LLC included the leadership and oversight of the Finance, Treasury, Accounting, Real Estate, Construction, Information Technology, Risk Management, and Internal Audit functions. Mr. Ortega also held the position of President of Golden Gallon Convenience Stores, a wholly-owned subsidiary of BI-LO, LLC, based in Tennessee. Prior to joining BI-LO, LLC, Mr. Ortega was with American Stores Company, holding various positions within their supermarket and drug store subsidiaries, including Vice President, Finance and Administration and Vice President, Logistics. Mr. Ortega also serves on the board of directors of James Avery Artisan Jewelry. Mr. Ortega has a B.S. in Accounting from the University of Arizona. Mr. Ortega was selected to serve on our Board because of his experience and knowledge of the consumer industry, including as our former Chief Executive Officer and Chief Operating Officer.

**Defendant Ray**

56.    Defendant Ray served as the Company's lead independent director from August 2021 until his resignation as a Company director on December 18, 2023. He also served as a member of the Compensation Committee and as the Chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Ray beneficially owned 5,179 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Ray beneficially owned approximately $63,236 worth of Leslie's stock as of that date.

57.    For the 2021 Fiscal Year, Defendant Ray received $136,209 in total compensation from the Company. This included $11,209 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant Ray received $177,462 in

total compensation from the Company. This included $103,489 in fees earned or paid in cash and $73,973 in stock awards.

58.    The Company's 2023 Proxy Statement stated the following about Defendant Ray:

**Mr. Ray** joined the Board in August 2021. Mr. Ray served from 2013 to 2020 in various leadership capacities at Stanley Black & Decker, Inc, a global industrial and consumer products company, most recently as President of STANLEY Engineered Fastening from 2019 to 2020. He previously served from 2009 to 2013 as Senior Vice President and General Manager of TE Connectivity Inc. (f/k/a Tyco Electronics) where he was responsible for its North and South American Automotive connectivity business. From 1993 to 2009 Mr. Ray served in numerous engineering and operational leadership roles at General Motors Company, where he began his career, and at Delphi Corporation following its spin-off from GM. He currently serves on the board of directors of Commercial Vehicle Group, Inc. (NASDAQ: CVGI) and Spirit AeroSystems Holdings, Inc. (NYSE: SPR). Mr. Ray was selected to serve as a director because he brings to the Board significant executive management and public board experience.

**Defendant Spofford**

59.    Defendant Spofford has served as a Company director since May 2022. She also serves as member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

60.    For the 2022 Fiscal Year, Defendant Spofford received $133,449 in total compensation from the Company. This included $29,670 in fees earned or paid in cash and $103,779 in stock awards.

61.    The Company's 2023 Proxy Statement stated the following about Defendant Spofford:

**Ms. Spofford** joined the Board in May 2022. Ms. Spofford currently serves as Chief Executive Officer and President of J. Jill, a women's apparel company. She also serves on J.Jill's board of directors. Prior to joining J.Jill

24

in February 2021, Ms. Spofford was the President of Cornerstone Brands, a holding company for several catalog operators, from December 2017 to October 2020. In that role, she oversaw a portfolio of four interactive, aspirational, home and apparel lifestyle brands: Ballard Designs, Frontgate, Garnet Hill and Grandin Road. She led the team there in evolving the brands into profitable, digitally- driven omnichannel businesses. Before being promoted into this role, from January 2014 to December 2017, Ms. Spofford was the President of Garnet Hill. Prior to that, Ms. Spofford was Senior Vice President and Chief Marketing Officer of J.Jill and held numerous leadership roles at Orchard Brands, including Interim President and Chief Executive Officer, Group President for Premium Brands, and President of Appleseed's. Before joining Orchard Brands, Spofford served as Vice President, Global Marketing of Timberland. Ms. Spofford currently serves on the board of directors of Reclaim Childhood, and she previously served on the boards of White Flower Farm and Project Adventure, Inc. Ms. Spofford received her M.B.A. from Babson College and her Bachelor of Arts in English and Political Science from the University of Vermont.

**Defendant Strain**

62.     Defendant Strain has served as lead independent director since December 19, 2023 and as a Company director since August 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Defendant Strain beneficially owned 72,223 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on December 31, 2022 was $12.21, Defendant Strain beneficially owned approximately $881,843 worth of Leslie's stock as of that date.

63.     For the 2021 Fiscal Year, Defendant Strain received $217,917 in total compensation from the Company. This included $92,917 in fees earned or paid in cash and $125,000 in stock awards. For the 2022 Fiscal Year, Defendant Strain received $261,886 in total compensation from the Company. This included $90,000 in fees earned or paid in cash and $171,886 in stock awards.

64.     The Company's 2023 Proxy Statement stated the following about Defendant Strain:

> **Mr. Strain** joined the Board in August 2018. Mr. Strain was the Head of e-Commerce and Technology at Gap, Inc., between October 2019 and May 2022. Gap, Inc. is an American worldwide clothing and accessories retailer founded in 1969. Mr. Strain had responsibilities in such role for technology, product management, data and analytics, and loyalty and payments. Mr. Strain also oversaw the digital business including e-commerce strategy and operations and digital and direct marketing. With almost 30 years in the retail technology and e-commerce space, Mr. Strain brings a consumer-centric mindset to a delivery orientation that has resulted in a track record of successful digital transformations. Prior to joining Gap Inc., Mr. Strain was the General Manager of the Retail and Consumer Goods Industry for Salesforce. Mr. Strain also spent 11 years at Williams-Sonoma Inc. as the Chief Digital and Technology Officer, where he was responsible for technology, product management, and digital marketing. Mr. Strain also spent 14 years as a management consultant. Mr. Strain received a B.S. in Finance from Santa Clara University where he was a member of the Retail Management Institute. Mr. Strain was selected to serve as a director due to his experience in various positions with consumer-facing companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as officers and/or directors of Leslie's, and because of their ability to control the business and corporate affairs of Leslie's, the Individual Defendants owed Leslie's and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Leslie's in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Leslie's and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to Leslie's and its shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Leslie's, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

68.    To discharge their duties, the officers and directors of Leslie's were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Leslie's, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

70.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business,

products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the officers and directors of Leslie's were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Leslie's were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Leslie's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Leslie's conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Leslie's and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Leslie's operations would comply with all applicable laws and Leslie's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to Leslie's and the shareholders the duty of loyalty requiring that each favor Leslie's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Leslie's and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial positions with Leslie's, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Leslie's.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Leslie's was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Leslie's, and was at all times acting within the course and scope of such agency.

## LESLIE'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### *Code of Ethics*

81.     The Company's Code of Ethics begins by stating that "[t]he Board of Directors [] has adopted this Code of Ethics [] in order to deter wrongdoing and promote" the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- accountability for adherence to the Code.

82.     The Code of Ethics provides that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below."

83.     The Code of Ethics provides, as to "Honest and Ethical Conduct," that:

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

84.     The Code of Ethics provides, as to "Conflicts of Interest," that:

A conflict of interest occurs when an individual's private interest interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

Loans by the Company to, or guarantees by the Company of, obligations of directors, officers, employees or their family members are of special concern. Loans by the Company to, or guarantees by the Company of, obligations of any director or executive officer are expressly prohibited.

Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized as described in the paragraph below.

Persons other than directors and executive officers who have questions about a potential conflict of interest or who become aware of an actual or potential conflict should discuss the matter with, and seek a determination and prior authorization or approval from, their supervisor or the General Counsel. A supervisor may not authorize or approve conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the General Counsel with a written description of the activity and seeking the General Counsel's written approval. If the supervisor is himself involved in the potential or actual conflict, the matter should instead be discussed directly with the General Counsel.

Directors and executive officers must seek determinations and prior authorizations or approvals of potential conflicts of interest exclusively from the Audit Committee.

85.     The Code of Ethics provides, as to "Corporate Opportunities," that:

All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and employees may not use Company property, information or position for personal gain. In addition, no director, officer or employee may compete with the Company.

86.     The Code of Ethics provides, as to "Fair Dealing," that:

Each director, officer and employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

87.     The Code of Ethics provides, as to "Protection and Proper Use of Corporate Assets," that:

All directors, officers and employees should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability and are prohibited.

All Company assets should be used only for legitimate business purposes. Any suspected incident of fraud or theft should be reported for investigation immediately, in accordance with the reporting procedure set forth below.

The obligation to protect Company assets includes the Company's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any non-public financial data or reports. Unauthorized use or distribution of this information is prohibited and could also be illegal and result in civil or criminal penalties.

88.     The Code of Ethics provides, as to "Compliance," that:

Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations of the United States and in the cities and states in which the Company operates.

Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department.

Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

89.     The Code of Ethics provides, as to "Disclosure," that:

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

90.     Additionally, the Code of Ethics provides under the "Disclosure" section that each "director, officer and employee who is involved in the Company's disclosure process" must:

- be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

- take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

91.     The Code of Ethics, provides, as to "Reporting and Investigating of Violations," that:

Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee.

Actions prohibited by this Code involving anyone other than a director or executive officer must be reported to the reporting person's supervisor, the General Counsel or the Ethics Line at 800- 826-6762.

After receiving a report of an alleged prohibited action, the Audit Committee, the General Counsel or the relevant supervisor must promptly take all appropriate actions necessary to investigate.

All directors, officers and employees are expected to cooperate in any internal investigation of misconduct.

92.     The Code of Ethics, provides, as to "Enforcement," that:

The Company must ensure prompt and consistent action against violations of this Code.

If, after investigating a report of an alleged prohibited action by a director or executive officer, the Audit Committee determines that a violation of this Code has occurred, the Audit Committee will report such determination to the Board.

If, after investigating a report of an alleged prohibited action by any other person, the relevant supervisor determines that a violation of this Code has occurred, the supervisor will report such determination to the General Counsel.

Upon receipt of a determination that there has been a violation of this Code, the Board or the General Counsel will take such preventative or disciplinary action as it deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

Violations of this Code will result in disciplinary action, up to and including termination of employment.

93.     The Code of Ethics, provides, as to "Waivers," that:

The Board or the Audit Committee (in the case of a violation by a director or executive officer) or the General Counsel (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code.

Any waiver for a director or an executive officer shall be disclosed as required by SEC and NASDAQ rules.

***Audit Committee Charter***

94.     Leslie's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

95.     Per the Audit Committee Charter, the purpose of the Audit Committee is to "oversee the Company's accounting and financial reporting processes and the audits of the

Company's financial statements." The Audit Committee "is responsible for maintaining free and open communication between itself and the independent auditor, internal auditor function and management of the Company, and for determining that all parties are aware of their responsibilities."

96.    The Audit Committee Charter lists, among the Audit Committee's responsibilities, the following, in relevant part:

- To review and discuss with the Company's independent auditor (1) the auditor's responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process, (2) the overall audit strategy, planning and staffing, (3) the scope and timing of the annual audit, (4) any significant risks identified during the independent auditor's risk assessment procedures and (5) when completed, the results, including significant findings, of the annual audit.

- To review and discuss with the Company's independent auditor and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditor or internal audit department during their audit work (such as restrictions on the scope of their activities or their access of information), (2) any significant disagreements with management and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's independent auditor or internal audit department and management.

- To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management

certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

- To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

- To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

- To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements.

- To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.

Verified Shareholder Derivative Complaint

97.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Ethics and law.

98.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Leslie's Background*

99.   Leslie's is a Delaware corporation based in Phoenix, Arizona. Leslie's describes itself as "as the largest direct-to-consumer brand in the U.S. pool and spa care industry, serving residential, professional, and commercial consumers." Leslie's has more than 950 store locations which sell a wide range of supplies for swimming pool maintenance and use, including chemicals, cleaning products, equipment, and parts, in addition to supplies for hot tubs and patio furniture.

100.   Of Leslie's wide variety of product offerings, about eighty percent are "non-discretionary" products necessary for the functioning of swimming pools and spas, including chemicals, pool equipment, cleaning products, and pool parts.

101.   According to the Company's public filings, due to the "non-discretionary nature" of Leslie's products and services, the Company has enjoyed "strong, uninterrupted growth and profitability in all market environments." Additionally, as a swimming pool supplies company, Leslie's product sales are largely seasonal and predictable; approximately seventy-five percent of the Company's sales are achieved between April and September, which constitutes the second half of the fiscal year for Leslie's. Indeed, Leslie's maintains that since swimming pool owners have no choice but to continue to maintain their pools by using "non-discretionary" chemicals, equipment, and parts, the Company enjoys an "annuity-like stream of demand" for those chemicals and products which creates a "highly predictable, recurring revenue model[.]" Moreover, since Leslie's founding in 1963, the Company grew sales for fifty-nine years in a row, until 2022.

102.   Leslie's initially went public in 1991 via an IPO, raising $28 million. The Company used the funds raised from the IPO to expand its business by adding hundreds of stores to its portfolio throughout the 1990s. In 1997, Leslie's was taken private by Hancock Park Associates and Leonard Green Partners L.P. after the Company's stock experienced significant volatility. The Company was later purchased by L Catterton, another private equity firm, in 2017.

103.   Approximately three years later, on October 29, 2020, Leslie's went public again, riding on the success that the swimming pool industry experienced during the COVID-19 pandemic, which brought about consumer interest in home activities such as enjoying residential swimming pools and home spas.

### Leslie's Takes Advantage of Uncertainty Over Product Availability

104.   Soon after the Company's 2020 IPO, a chlorine-based chemical tablet product named Trichlor, which was crucial for swimming pool maintenance, almost doubled in price due to supply chain issues arising from the COVID-19 pandemic and an August 2020 fire at BioLab in Lake Charles, Louisiana, one of the primary chlorine plants in the United States.

105.   Leslie's quickly used the chemical shortage to boost business by spurring consumer demand for its products. In the first quarter of Leslie's 2022 Fiscal Year, the Company sent letters to a sizable portion of its customers representing that Leslie's could not "guarantee product availability" and that, as a result, customers should purchase products while Leslie's had them in stock. Based on these representations, many of Leslie's customers purchased excessive amounts of pool chemical products in stockpile fashion to

avoid the chance of facing unavailability of chemical products in the future. However, at the same time, the Individual Defendants told investors that Leslie's enjoyed "very durable" and "recurring demand" for its products and that the Individual Defendants "just haven't seen any indication of any meaningful pull-forward" customer buying activity.

106.   During the Relevant Period, the Individual Defendants touted the Company's "healthy ongoing consumer demand" and "durable demand" driven by "strategic growth initiatives" in press releases and earnings calls throughout 2022 and well into 2023. Later, when the Company's sales decreased between February and May 2023, the Individual Defendants attributed the slowdowns to poor weather conditions and the "seasonal purchasing cycle" of customers. Nevertheless, the Individual Defendants maintained Leslie's financial guidance for the 2023 Fiscal Year.

107.   However, unknown to investors and the public, due to customers overbuying and hoarding pool products in 2021 and 2022, Leslie's third quarter of 2023 financial results would fall significantly below what the Company had forecasted.

108.   Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, financial success, and growth. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's customers purchased more pool chemicals than needed during and after the COVID-19 pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by

artificial demand from a feared product shortage; (4) the Company concealed the true cause of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result, the Company's public statements depicting Leslie's growth as "durable," "show[ing] no signs of slowing," and being based upon "healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company  was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **False and Misleading Statements**

#### *February 3, 2022 Press Release*

109.   On February 3, 2022, Leslie's issued a press release that announced the Company's financial performance for the first quarter of 2022 ended January 1, 2022 ("Q1 2022"). The press release represented to investors that, for Q1 2022, the Company's sales rose 27.5% when compared to Q1 2021, reaching $184.8 million. The press release further

represented that, for Q1 2022: (1) the Company's sales growth rose 20.5% when compared to Q1 2021; (2) the Company's gross profit increased 30.2% when compared to Q1 2021, reaching $67.3 million; and (3) the Company's gross margins increased 70 basis points compared to Q1 2021. In addition, the press release represented that the Company's adjusted EBITDA improved by $1.3 million to $1.1 million compared to a slight loss in Q1 2021.

110.    The press release also revealed that, based on these positive financial results, the Company was increasing its guidance for the 2022 Fiscal Year, raising its sales outlook by $20 million, gross profit by $10 million, and adjusted EBITDA by $5 million. The press release further stated that Leslie's repurchased 7.5 million shares at a price of $152 million under the recently enacted share repurchase agreement.

111.    The press release included a statement from Defendant Egeck which represented to investors that "[c]ontinued industry tailwinds, ***the competitive advantages derived from our integrated platform of physical and digital assets, and strong execution of our strategic growth initiatives drove record first quarter results***. With this strong start, we remain confident in our ability to continue to perform at a high level for the balance of the year." [4]

***February 3, 2022 Conference Call***

112.    That same day, on February 3, 2022, Leslie's held an earnings call with analysts and investors to discuss the Company's financial performance for Q1 2022. During the call, Defendant Egeck stated that the Company "continue[s] to see the pool and

---

[4] All emphasis is added unless otherwise indicated.

hot tub industry benefit from strong consumer demand in the quarter[…]" and had "seen no evidence of these macro trends abating." He further stated that the Company is "***benefiting from strong secular macro trends that are driving durable consumer demand and are showing no signs of slowing[,]***" and that "great execution by our merchandise team has put us in a favorable and advantaged inventory position." Defendant Egeck also explained that, despite retail price inflation being higher than expected, almost reaching 12%, Leslie's "didn't see any associated slowdown in demand."

113.   Additionally on the call, Defendant Weddell stated that, despite widespread inventory constraints across the pool industry, especially for chemicals and equipment, the Company's end-of-quarter inventory was up 40% to $245 million compared to $175 million at the end of the prior year quarter. Defendant Weddell guaranteed investors that they had "***an always-on procurement strategy at Leslie's. Our team continues to proactively work with our vendor partners to manage the flow of inventory, and we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season.***"

114.   Later on the call, in response to an analyst's question about the impact of inflation on Leslie's, Defendant Egeck represented that the Company "really [hasn't] seen any drop in demand[,]" explaining that "[i]n fact, 2 of the higher inflation categories, equipment and basic sanitizers showed the strongest growth," supporting the "continuing very durable demand." He continued, stating that the high demand caused the Company's "consumer file … to show strong sustained growth" in excess of 11%, which produced

"our ninth straight quarter of double-digit file growth driven by our digital marketing capabilities and compelling assortment."

### February 4, 2022 Form 10-Q

115.    On February 4, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended January 1, 2022 (the "1Q22 10-Q"). The  1Q22 10-Q  was signed by Defendant Weddell and contained certifications, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Egeck and Weddell, attesting to the accuracy of the financial statements contained in the 1Q22 10- Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 1Q22 10-Q stated that "[t]here have been no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended October 2, 2021," filed on December 10, 2021 (the "2021 10-K"). The same risk disclosures that were included in the 2021 10-K were included in the 1Q22 10-Q:

> *We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations.*
>
> We base our inventory purchases, in part, on our sales forecasts. *If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins*. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

### May 5, 2022 Press Release

116.   On May 5, 2022, Leslie's issued a press release that announced the Company's financial performance for the second quarter of 2022 ended April 2, 2022 ("Q2 2022"). The press release represented to investors that, for Q2 2022, the Company's sales rose 18.5% when compared to Q2 2021, reaching $228.1 million. The press release further represented that, for Q2 2022: (1) the Company's sales growth rose 13.3% when compared to Q2 2021; (2) the Company's gross profit increased 19.5% when compared to Q2 2021, reaching $85.6 million; and (3) the Company's gross margins increased 30 basis points compared to Q2 2021. In addition, the press release represented that the Company's adjusted EBITDA was $8.7 million for Q2 2022 compared to $9.5 million in Q2 2021.

117.   The press release also revealed that, based on these positive financial results, the Company was increasing its guidance for the 2022 Fiscal Year, raising its sales outlook by $85 million, gross profit by $38 million, and adjusted EBITDA by $18 million.

118.   The press release included a statement from Defendant Egeck wherein he represented to investors that the "non-discretionary, recurring nature of after-market pool industry demand, *our team's strong execution against our strategic growth initiatives, and an advantaged inventory position were all key drivers of our performance*." Defendant Egeck additionally stated that the Company was "ready to meet the needs of our customers" for the 2022 pool season.

### May 5, 2022 Earnings Call

119.   On May 5, 2022, Leslie's held an earnings conference call with analysts and investors to discuss the Company's Q2 2022 financial results. During the call, Defendant Egeck told investors that Leslie's Q2 2022 "performance continued our streak of record

results and illustrates our competitive advantages in serving the nondiscretionary annuity-like demand of the aftermarket pool industry." He further stated that, during Q2 2022, the Company combatted inflation by "implement[ing] additional pricing actions to maintain product margin rates," stressing that "[c]onsumers have accepted the increased retail prices, and we did not see any associated slowdown in demand." Defendant Egeck also reported that the industry was still facing constrained supply conditions, stating *"[w]ith regard to chlorine tabs, supply remains constrained," and "domestic Trichlor capacity is tight and falling short of elevated consumer demand.*" But regarding Leslie's, Egeck told investors:

> *I'm going to say we're happy with our current supply, though the flow of it could be a little more front loaded, still pleased with the supply. We're in line to buy even more next year, need to feed the machine we've created for chemical consumption and the [Company's] growing consumer profile.*

120.   On the call, Defendant Egeck also stated that the Company witnessed "strong secular macro trends that are driving durable consumer demand and are showing no signs of slowing" and reiterated to investors and analysts that "more than 80%" of the Company's sales were "nondiscretionary and benefits from recurring annuity-like demand." Defendant Egeck then continued, noting that "in the core businesses of chemicals and equipment and part and repair and maintenance, we have not seen any indication of a decrease in demand." Later during the call, Defendant Egeck touted that Q2 2022 "was our tenth straight quarter of strong [consumer file] growth" and that "[w]e are driving this file growth with digital marketing."

121.   Also, during the call, Defendant Weddell reiterated that the Company "*continue[d] to expect inventory conditions in the industry to remain tight throughout fiscal 2022, particularly for chemical*," and that Leslie's finished Q2 2022 with $345

million in inventory, up 24% compared to $278 million at the end of the prior year same quarter. Defendant Weddell additionally represented to investors and analysts that Leslie's "continues to proactively work with our vendor partners to manage the flow of inventory and *we continue to identify opportunities to strategically invest in inventory to meet heightened consumer demand and prepare for pool season*."

122. During the Q&A part of the call, a William Blair & Co. L.L.C. analyst stated "from a high level, it looks like you['re] [a] COVID winner, your top line has been very strong, stronger than typical history[,]" and then asked if the Company "tried to calculate a potential pull-forward estimate or is this just not your view because of the macro drivers and share gain in price?" Defendant Egeck replied:

> *I would say it's not our view, both for the reasons you stated. And also, due to the fact that we track that very carefully.* We're able to see by consumer what they purchased prior years versus what they've purchased year-to-date. It's one of the things that we try to pay a lot of attention to. *And we just haven't seen any indication of any meaningful pull-forward.*

123. Defendant Egeck further elaborated in his response to the William Blair analyst by stating the following:

> *I started with the first question saying we don't see any evidence of any significant pull-forward. And in fact, with [unit per transaction], I think we're seeing kind of just the opposite people buying more items but perhaps smaller quantities.*

124. In answering another question from an analyst regarding if Company leaders were witnessing any consumer "trade down or pull back" in purchasing Leslie's products, Defendant Egeck replied: "*I think what you're seeing in our business is nondiscretionary nature of the vast majority of it and recurring demand. . . . [A]nd in the core businesses*

*of chemicals and equipment and parts and repair and maintenance, we have not seen*

*any indication of a decrease in demand*."

### June 6, 2022 Robert W. Baird Analyst Conference Call

125.   On June 6, 2022, Robert W. Baird hosted an analyst conference call which Defendant Weddell attended. During the call, an analyst asked Defendant Weddell the following questions regarding the Company's inventory in relation to product sales:

> And I guess the other question would just be maybe on inventory. So I mean, inventory has been a popular topic in retail for the last couple of weeks. How does inventory look for you guys? How do you feel about that given the flow of business?

126.   Defendant Weddell emphasized "heightened demand" for Leslie's products in his reply to the analyst:

> Sure. Yes. We took a strategic – we've made a strategic decision last year to heavily invest in inventory. If you remember, most of the inventory that we have is nondiscretionary. It's not something fashion risk or obsolescence. If you look at the end of Q2, our fiscal Q2, effectively at the end of March, up $70 million or up 25%. *So we worked very hard and closely with our vendors to procure effectively as much inventory as we can to meet the heightened demand that we see today, and it's a competitive advantage.*
>
> *So I feel very good with our inventory position today.*

### June 7, 2022 William Blair Analyst Conference Call

127.   The next day, on June 7, 2022, William Blair hosted an analyst conference call which Defendant Weddell attended. During the call, Defendant Weddell again spoke on Leslie's inventory position after receiving another question from an analyst regarding the Company's inventory situation: *"I think at this point, we wish we had more. So we believe this year, we will still not have all the inventory that we need to meet all the*

*demand that's out there, but certainly feel better about the inventory position today than in prior years."*

### August 5, 2022 Press Release

128.   On August 5, 2022, the Company issued a press release announcing the Company's financial performance for the third quarter of 2022 ended July 2, 2022 ("Q3 2022"). The press release stated that the Company's financial results for Q3 2022 were negatively affected by "execution issues" at its distribution center in New Jersey. Despite these issues, the press release represented to investors that, for Q3 2022, the Company's sales rose 12.9% when compared to Q3 2021, reaching $673.6 million, for a comparable sales increase of 7.4%. The press release further represented that, for Q3 2022, the Company's gross profit increased 7% when compared to Q3 2021, reaching $303.6 million. However, the press release revealed that gross margins decreased by 250 basis points in Q3 2022 "primarily due to shifts in business mix, decreased product margin and higher distribution expenses[.]" Moreover, the press release represented that, in Q3 2022, the Company's adjusted EBITDA rose 2% compared to Q3 2021 to $182.9 million.

129.   Due to the "execution issues," Leslie's reduced its guidance for the 2022 Fiscal Year, lowering sales outlook to $1,550 million to $1,570 million (from $1,575 million to $1,610 million), gross profit outlook to $655 million to $670 million (from $700 million to $715 million), and adjusted EBIDTA outlook to $287 million to $297 million (down from $315 million to $330 million).

130.    The press release included a statement from Defendant Egeck wherein he stated that the "elevated distribution costs" used for improving operations would "continue to fuel our market share gains."

**August 5, 2022 Earnings Call**

131.    On August 5, 2022, Leslie's held an earnings call with analysts and investors to discuss the Company's Q3 2022 financial results. During the call, Defendant Egeck told investors that "our year-over-year results and market share gains are evidence that the fundamental drivers of the pool industry, the durable competitive advantages of the Leslie's operating model and the effectiveness of our strategic growth initiatives remain intact." He also maintained that "[t]he pool and hot tub industry continued to benefit from strong consumer demand in the quarter, and the secular trends driving that demand remain intact." Defendant Egeck emphasized that "[a]verage revenue per consumer grew 13.7% in the quarter" which "exceeded the impact of inflation, and reflects our growing wallet share." He later told investors and analysts that if Leslie's had not faced operational issues, the Company would have "run a 13% comp" to Q3 2021, stating that "***demand, we think, is very much alive and stable.***" In similar fashion, Defendant Weddell stated that "***demand for our core nondiscretionary product remains solid.***"

132.    During the call, Defendant Weddell further discussed Leslie's inventory, stating that Leslie's ended Q3 2022 with $361 million in inventory, up 61% from $224 at the end of Q3 2022. Defendant Weddell specifically stated: "***[W]e view our current inventory position as appropriate given the uncertainty of supply for the balance of the year and into fiscal 2023.***" During the Q&A portion of the call, analysts inquired about

Leslie's inventory levels and what the market should anticipate for the conclusion of the 2022 pool season in Q4 2022. In response, Defendant Weddell represented that Leslie's anticipated product inventory to stay high, but boasted that "*we're in a much better position from a Trichlor perspective across our network, both - - all stages, raw materials, produced goods, in our DCs and in our stores*." He elaborated, stating, among other things, that Leslie's had "appropriate "inventory levels:

> *[I]f the choice is to take inventory at a little bit higher level today, going into the end of the year and to start off next year in a better position versus try to run leaner. We will take the former in the current environment. So it's something we expect to actively manage in the year-end and through next year, don't necessarily view these levels as permanent increases. But in the current environment, it's the appropriate level of inventory*.

133.   Defendant Egeck also stated on the conference call that "*Trichlor inventory is in good shape.*"

### *November 30, 2022 Press Release*

134.   On November 30, 2022, the Company issued a press release that announced its financial performance for the fourth quarter of 2022 ("Q4 2022") and 2022 Fiscal Year, both ended October 1, 2022. The press release stated that compared to the 2021 Fiscal Year, Leslie's sales increased $1,562.1 million, or 16.3%. Sales growth grew 10.6% as compared to the previous year, gross profit rose 13.2% to $673.7 million, and gross margin was 43.1%. Adjusted EBITDA rose 8% when compared to the previous year, to $292.3 million.

135.   The press release also contained the Company's first guidance for the 2023 Fiscal Year, which included sales between $1,560 million to $1,640 million, gross profit

between $667 million to $708 million, and adjusted EBITDA between $280 million and $310 million.

136.   The press release included a statement from Defendant Egeck regarding the 2022 Fiscal Year, where he noted that "execution of our strategic growth initiatives resulted in record sales, gross profit and adjusted EBITDA, as well as market share gains." He maintained that Leslie's "***remain[s] focused on delivering against our long-term objectives supported by the recurring non-discretionary demand of the aftermarket pool industry, the competitive advantages of our integrated network of physical and digital assets and the execution of our strategic growth initiatives[.]***"

***November 30, 2022 Earnings Call***

137.   On November 30, 2022, Leslie's held an earnings conference call with analysts and investors to discuss the Company's Q4 2022 and 2022 Fiscal Year financial results, as well as the drivers of the Company's fiscal year 2022 performance, 2023 Fiscal Year guidance, and the Company's growth opportunities. During the call, Defendant Egeck boasted that the Company's "Q4 and full year performance reflects the tremendous efforts and contributions of our associates and vendor partners to meet continued strong consumer demand in the face of the discrete operating challenges." He continued, "[t]hroughout 2022, Leslie's [and] the pool industry benefited from the continuation of strong consumer demand. This demand was driven by the macro trends that accelerated with the onset of the pandemic and … have created a pool industry that is significantly larger than it was pre-pandemic." Defendant Egeck further represented to investors that Leslie's 2023 Fiscal

Year guidance was  conservative, and that the Individual Defendants "*do not see a scenario where we give back significant portions of the gains over the last 3 years*."

138.    During the call, Defendant Weddell reported inventory of $362 million at the end of the 2022 Fiscal Year, an 82% increase compared to inventory of $199 million at the end of the 2021 Fiscal Year. Defendant Weddell maintained that the rise in inventory was due to non-discretionary product, stating that "[b]oth, the equipment and chemical product categories, are nondiscretionary in nature and are not subject to technology or fashion risk. *We view our current elevated inventory position as appropriate given the uncertainty of supply going into fiscal 2023.*"

139.    Defendant Weddell also stated that "*when we feel we can adequately meet consumer demand and we see an improvement in supply chains, then we will pursue opportunities to reduce inventory.*" Later in the call, Defendant Weddell repeated this statement, stating:

> And as a reminder, we primarily sold nondiscretionary products. And most of the incremental inventory falls into the chemical and equipment categories that are not subject to technology or fashion risk. *When we believe we have sufficient inventory to meet consumer demand through season and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down to recoup some of the investments we have made in working capital over the last few years*.

140.    Also, during the Q&A part of the earnings call, an analyst asked a question regarding pool chemical prices and consumer conduct. Defendant Weddell replied that Leslie's noticed "consumers in some scenarios, or some situations look for smaller sized buckets.... But overall the demand is still there." Later on the call, Defendant Weddell added, "[m]any of the macro trends driving consumer demand in the pool industry remain

intact and should continue to drive growth over the next several years." He also stated that the Company was "seeing nice demand" for pool chemicals and was not considering dropping Trichlor prices.

**November 30, 2022 Form 10-K**

141.   On November 30, 2022, Leslie's filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Ortega, Egeck, Weddell, Daniel, Kozlak, Kufel, Magliacano, O'Farrell, Ray, Spofford, and Strain and contained SOX certifications signed by Defendants Egeck and Weddell attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2022 10- K stated the following regarding risk disclosures pertaining to inventory:

> *We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations*.
>
> We base our inventory purchases, in part, on our sales forecasts. *If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins*. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

**January 27, 2023 Proxy Statement**

142.   On January 27, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Daniel, Egeck, Kozlak, Kufel, Magliacano, O'Farrell, Ortega, Ray,

Spofford, and Strain solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

143.   The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Ray and Strain to the Board; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the Company's named executive officer compensation. The misrepresentations and omissions set forth herein were material to shareholders in voting on re-electing Defendants Ray and Strain to the Board. Shareholders would not have approved the re-election of Defendants Ray and Strain to the Board had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

144.   With respect to the Company's Code of Ethics, the 2023 Proxy Statement stated:

> The Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee each operate pursuant to written charters adopted by the Board. These charters, along with the Corporate Governance Guidelines and the Code of Ethics, are available at the Company's website and in print to any shareholder who requests a copy. To access these documents from the Company's website, go to ir.lesliespool.com and select "Governance Documents" from the "Governance" drop-down menu. Requests for a printed copy should be addressed to Corporate Secretary, Leslie's, Inc., 2005 East Indian School Road, Phoenix, Arizona 85016.

145.   Regarding the Board's "Risk Oversight," the 2023 Proxy Statement stated:

> A core responsibility of the Board is to understand the principal risks associated with the Company's business on an ongoing basis, and oversee the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards. While the Audit Committee has primary responsibility for risk oversight, both the Audit Committee and the Board are actively involved in risk oversight and both receive reports on

our risk management activities from our executive management team on a regular basis. Members of both the Audit Committee and the Board also engage in periodic discussions with members of management as they deem appropriate to review and address the proper management of the Company's risks. In addition, each committee of the Board considers risks associated with its respective area of responsibility.

146.   Defendants Daniel, Egeck, Kozlak, Kufel, Magliacano, O'Farrell, Ortega, Ray, Spofford, and Strain caused the 2023 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed its directors and officers adhere to the Code of Ethics and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Ethics either without waivers or without such waivers being disclosed; and (2) the Board and its committees were not properly exercising their risk oversight functions, including their review of the risk exposures described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board.

147.   In addition, the 2023 Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading, because the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's customers purchased more pool chemicals than needed during and after the COVID-19 pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by artificial demand from a feared product shortage; (4) the Company concealed the true cause of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result, the Company's public statements depicting Leslie's growth as "durable," "show[ing] no

signs of slowing," and being based upon "healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls.

148.   As a result of Defendants Daniel, Egeck, Kozlak, Kufel, Magliacano, O'Farrell, Ortega, Ray, Spofford, and Strain causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia,* to: (1) re-elect Defendants Ray and Strain to the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the Company's named executive officer compensation.

### *February 2, 2023 Press Release*

149.   On February 2, 2023, Leslie's issued a press release that announced the Company's financial performance for the first quarter of 2023 ended December 31, 2022 ("Q1 2023"). The press release stated that, "despite significant weather headwinds,"

Leslie's sales increased $195.1 million, or 5.6%, but due to the weather, sales compared to the first quarter of 2022 had decreased 4%. Gross profit was $65.3 million, representing a 3% decrease from the same time the year prior. Similarly, gross margin was 33.5%, down 290 basis points from the same time the year prior. Adjusted EBITDA was a $11.9 million loss, which was significantly less than the $1.1 million gain Leslie's had from the same time the year prior.

150.    The press release also included a statement from Defendant Egeck, who despite the gloomy results, struck an optimistic tone, stating that "topline growth and continued market share gains are a testament to the durable competitive advantages derived from our integrated system of physical and digital assets as well as our team's strong execution against our diversified growth initiatives." He went on to say that for "the remainder of the year and the upcoming 2023 pool season, we believe we are well positioned to deliver on our financial and operational objectives." The Company kept its previous guidance for the 2023 Fiscal Year.

### February 2, 2023 Earnings Call

151.    On February 2, 2023, Leslie's held an earnings conference call with analysts and investors to discuss the Company's Q1 2023 financial results. During the call, Defendant Egeck stated that "[g]iven the seasonality of our business, the loss in the quarter was anticipated and does not change our expectations for the full year." He also emphasized that "the first quarter is our smallest quarter of the year, representing only about 12% of total year sales." Defendant Weddell reported that the Company had $430 million in inventory at the end of the quarter, an increase of 76% compared to $245 million at the end

of the prior year quarter. Defendant Weddell told investors that "our first priority is to put the company in a position to meet consumer demand for the season. *In furtherance of that objective, we continue to view our current elevated inventory position as appropriate and sensible given the uncertainty of supply*."

152. Defendant Weddell further stated that *"[w]hen we believe we have sufficient inventory to meet consumer demand through season, and after we see supply chains across the industry become more predictable, then we will strategically manage inventory levels down."*

153. During the Q&A portion of the call, Defendant Egeck emphasized that "*the way to think about demand is to keep in mind, it's a very small quarter, right, for the whole industry. And I know we've said that a lot. But again, trying to extrapolate trends from this first quarter, which is: a, small; and b, had a really outsized weather impact, I just think that's tricky*." Indeed, on numerous occasions during the call, he suggested the "*super small quarter, upsized weather impact*" as the reason to "*not to draw any trends for the full year*" and that " *we didn't see anything despite those 2 factors that would tell us we need to*."

154. During the Q&A portion of the earnings conference call, multiple analysts voiced worry about the Company's inflated inventory levels. For example, a William Blair analyst asked Defendant Weddell: "Can we start with inventory, Mike? The inventory kind of pops off the page and up a bit sequentially. How much is safety stock? And when do you see inventory normalizing?" Defendant Weddell replied by stating the following:

> . . . *[T]here's 2 key reasons that inventory is up, one is sales growth over the last year – last few years. And then importantly, the strategic decision*

*that we made to intentionally pull forward 2023 receipts in advance of season*

*So the pull forward allows us to load our stores with more product and facilitate the replacement cycle during the early part of our season*

*But again, the inventory that we're procuring today is for this season. And it's inventory that is being brought in earlier in preparation for season. It's not stocking up for kind of longer-term needs.*

155.    Defendant Weddell also discussed Trichlor inventory and inventory growth during Q1 2023, stating the following:

*We feel good about the inventory that we have in our facilities and in our stores. Again, when you think about that composition of product that we're bringing in early, it's high-turn product, top SKUs that we know we need for full season and where last year we talked a lot about kind of getting behind the curve and replenishment cycle.*

*. . . . So I feel good with the position we have in inventory today.*

156.    Defendant Egeck further elaborated on Trichlor inventory levels during the call. When an analyst asked Defendant Egeck what he thought about the Company's competitors holding too much Trichlor in their inventory, he replied:

*[I]n Trichlor [inventory], that's really us, and we control most of that supply chain now, particularly with our – particularly with our investment in stellar tableting.*

*So we feel good about where we are with Trichlor, but we've also bulked up the inventory there as well, with the idea that we're going to preposition a much higher percentage of it into the stores themselves.*

*February 3, 2023 Form 10-Q*

157.    On February 3, 2023, the Company filed its quarterly report with the SEC for the quarter ended December 31, 2022 (the "1Q23 10-Q") with the SEC. The 1Q23 10-Q which was signed by Defendant Weddell and contained SOX certifications signed by

Defendants Egeck and Weddell attesting to the accuracy of the financial statements contained in the 1Q23 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 1Q23 10-Q stated the following regarding risk disclosures relating to inventory levels:

> **We may not be able to successfully manage our inventory to match consumer demand, which could have a material adverse effect on our business, financial condition, and results of operations**.

> We base our inventory purchases, in part, on our sales forecasts*. **If our sales forecasts overestimate consumer demand, we may experience higher inventory levels, which could result in the need to sell products at lower than anticipated prices, leading to decreased profit margins**. Conversely, if our sales forecasts underestimate consumer demand, we may have insufficient inventory to meet demand, leading to lost sales, either of which could materially adversely affect our financial performance.

### *May 3, 2023 Press Release*

158.  On May 3, 2023, Leslie's issued a press release that announced the Company's financial performance for the second quarter of 2023 ended April 1, 2023 ("Q2 2023"). The press release stated that Leslie's sales decreased 6.7% and sales compared to Q2 2022 had decreased 13.5%, *"which included the impact of the normalization of the seasonal purchasing cycle to pre-pandemic patterns and adverse weather*." Moreover, the Company's gross profit decreased 16.9%. Similarly, gross margin was 33.4%, down 410 basis points from Q2 2022. Adjusted EBITDA was a $8.4 million loss, which was comparable to the $8.7 million loss Leslie's had from Q2 2022.

159.  Defendant Egeck attributed the results to "the industry and *Leslie's experienc[ing] comparable sales headwinds related to the normalization of the seasonal*

*purchasing cycle to pre-pandemic patterns, as well as adverse weather in key markets*[.]" However, Defendant Egeck emphasized that *"[u]nderscoring these results was the strong execution of our diversified growth initiatives by our teams which helped to drive continued market share gains and position us well to deliver against our objectives as we head into the all-important pool season*." Nevertheless, Leslie's kept its forecasted guidance for the 2023 Fiscal Year that the Company initially made on November 30, 2022.

### May 3, 2023 Earnings Call

160.    On May 3, 2023, Leslie's held an earnings call with analysts and investors to discuss the Company's Q2 2023 financial results. During the call, Defendant Egeck stated that "[w]ith supply chain issues largely behind us" Leslie's was just experiencing a "*more normalized pre-pandemic revenue contribution breakdown with 25% in the first half of the year and 75% in the second half.*" He emphasized that *"[t]o be clear, we believe this change in seasonal consumer purchasing behavior is a timing shift and not a reduction in underlying demand for the year.*" In similar fashion, Defendant Weddell told investors and analysts that "[w]ith product more available across the industry this year, *we believe consumers are more closely aligning their purchases with their need for product during the primary pool season,*" but further stated that it is "*important to note that we believe this behavior impacts the timing of sales, not the absolute dollars expected to be generated this year.*" He concluded that "based on performance for the first half of the year, which is in line with historical seasonal trends prior to the pandemic, we are reaffirming our outlook."

161.   Defendant Egeck also stated that "sales across the pool and hot tub industry were down in the quarter," because of "the [] shift to normalized seasonal consumer purchase patterns" and "consumers [being] less confident based on the challenging macroeconomic backdrop," and further because "weather was a significant negative factor year- over-year for key markets."

162.   Despite these issues, Defendant Egeck told investors and analysts that the Company's "competitive advantages derived from our integrated system of physical and digital assets and our associates' strong execution of our diversified growth initiatives drove nearly 500 basis points of sales outperformance in the quarter[,]" and also stated that the Company was "encouraged that applying a normalized pre-pandemic first half, second half contribution split to our first half results indicates our full year sales and earnings guidance is still appropriate."

163.   Defendant Egeck also stated, for the first time, that robust sales in Q2 2022 were spurred by the letter that Leslie's had sent to customers declaring that a chemical shortage would affect availability into the pool season. Yet, he neglected to inform investors that Leslie's actually sent the letter in an effort to unload the Company's excess inventory it had been holding since the end of the 2021 Fiscal  Year:

> [W]e, at one point last year in the first quarter, actually sent a letter to our loyalty file, saying we couldn't guarantee product availability in the second half and encouraged them to purchase early prior to the pool season. And whether on their own or because of that letter, we saw a lot of that. And that was that 210 to 260 basis points increase in last year's Q2 in terms of the total year's contribution.

164.   During the Q&A portion of the call, a Jeffries LLC analyst again inquired about the Company's Trichlor inventory and asked Defendants Egeck and Weddell the

following question, asking if they were aware of customers holding excess amounts of

chemical products:

> Do you have a sense of how much safety stock your PRO customers have to run through before they need to purchase in greater quantities? And I guess, similar question for the homeowner, although I presume safety stock is less of a relevant concept here. But just trying to get a sense of kind of it sounds like this is going to be the peak for inventory and you're going to kind of focus on working down that inventory and convert to cash flow. So just trying to get some sense around that dynamic.

165.    Defendant Weddell replied:

> ***We feel very good with where we're at going into season if you look at the year-on-year change in Q2, primarily around chemicals. . . . So at this point, going into season, heaviest use from a chemical perspective, we feel very good with our current inventory balances.***

> ***The top 2 contributors, the inventory increase were still the chemical and equipment categories, which we've talked a lot about being nondiscretionary in nature. So we feel good with where we're at. And as you stated, I absolutely believe that we're at peak and we have an opportunity to materially decrease our inventory levels into year-end and beyond.***

166.    The statements referenced above in ¶¶ 109-141, and 149-165 were materially

false and misleading and failed to disclose material facts necessary to make the statements

made not false and misleading. Specifically, the Individual Defendants willfully or

recklessly made false and misleading statements and omissions of material fact that failed

to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage

due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's

customers purchased more pool chemicals than needed during and after the COVID-19

pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by

artificial demand from a feared product shortage; (4) the Company concealed the true cause

of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result, the Company's public statements depicting Leslie's growth as "durable," "show[ing] no signs of slowing," and being based upon "healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

167.   On July 13, 2023, earlier than expected, Leslie's filed a Form 8-K with the SEC which was signed by Defendant Weddell and contained a press release revealing the Company's preliminary financial performance for the third quarter of 2023, ending on July 1, 2023. The press release revealed disappointing financial results, disclosing that the Company now expected third quarter of 2023 sales to be $611 million, down 9% from the previous year, representing a comparable sales decline of 12%. Additionally, gross profits

were expected to drop almost 18% to between $249 million to $251 million. Gross margins would be 41% after dropping 410 basis points when compared to the previous year. Moreover, adjusted EBITDA was expected to drop more than 30% to between $124 million to $128 million.

168.   Due to this poor financial performance, Leslie's cut its 2023 Fiscal Year guidance. Net sales were reduced to $1,430 million to $1,450 million (from $1,560 to $1,640 million), gross profit was reduced to $549 to $559 million (from $667 to $708 million), and adjusted EBITDA was reduced to $170 to $180 million (from $280 to $310 million).

169.   The press release also contained a statement from Defendant Egeck, who admitted, for the first time, that customers overbought chemicals last pool season:

> Our fiscal third quarter results were well below our expectations as low double digit traffic declines in our Residential and Pro businesses drove negative comps across both discretionary and non-discretionary categories. While abnormal weather continued to pressure traffic levels, customer surveys conducted towards the end of the quarter also indicated increased price sensitivity and that ***consumers entered the pool season with a greater than normal amount of chemicals left[ ]over from last year.***

170.   The press release additionally revealed that Leslie's CFO, Defendant Weddell, would vacate his position effective August 7, 2023 and would be replaced by Scott Bowman. As part of this agreement, Defendant Weddell transitioned to an advisor role until December 31, 2023.

171.   The press release further revealed that reduced product demand, lower in the third quarter of  2023, made it difficult for Leslie's to pass through cost increases, which in turn, reduced gross margins. Specifically, the press release revealed that the Company's

gross margins were affected by "higher distribution-related expenses." Defendant Egeck stated the following in the press release:

> Our third quarter gross margins were down year-over-year due to higher product costs that we could not pass through to consumers, the impact of higher distribution-related expenses and capitalized costs as we reduce inventory from peak levels, and fixed cost deleverage. . . . We also continue to aggressively manage our inventory balances . . . .

172.   Analysts and investors reacted in shock to the news. William Blair analysts downgraded Leslie's rating, stating that the "Shocking Prerelease [was] Well Below Street," warning that there was a "lack of visibility into improving sales," and emphasizing that the "pull-forward of chemical needs due to shortages last year" was one of "the big issues." Loop Capital Markets analysts reacted in similar fashion by downgrading their rating of Leslie's, stating that "pretty much everything in the company's preliminary earnings release was more negative than we could have anticipated," and declaring that "management's credibility will need to be restored." Jeffries' analysts also downgraded Leslie's until "1) visibility into the unwind of chemical carryover from '23 is clear, and 2) comfort is established w/ the incoming CFO following a 60% guidance cut." Jeffries explained that the "image" of Leslie's purported "loyal customers . . . is blurred now by prior-year stock-up activity" with "implications" that "[g]o-forward demand will look worse than previously expected due to lower transactions."

173.   On this news, the Company's stock price fell $2.82 per share, or 29%, from closing at $9.52 per share on July 13, 2023, to closing at $6.70 per share on July 14, 2023. The Company's stock price fell another $1.24 per share, or 18%, the following trading day, to close at $5.46 per share on July 17, 2023.

**Subsequent Developments**

174.   On August 2, 2023, Leslie's issued a press release announcing the Company's third quarter of 2023 financial performance. Leslie's provided the same financial results provided in the July 13, 2023 press release.

175.   That same day, the Company held an earnings conference call with investors and analysts to discuss the Company's financial performance for the third quarter of 2023. During the call, Defendant Egeck stated "a portion of our customers had a greater-than-normal amount of chemicals left over from last year . . . validated by 2 separate consumer surveys," noting that this "consumer behavior is not something we have seen before." He also stated that another factor was "increased consumer price sensitivity [because] [a]fter 3 years of significant price inflation, consumers were not willing to absorb price increases during the quarter."

176.   Later on the call, Defendant Egeck told investors and analysts that "the lack of [loyalty] file growth, . . . has a lot to do with the 2 surveys that we ran, which showed a larger-than-normal amount of product left over in the industry in the consumers' hands. We've turned to calling it the garage and shed inventory internally." He also stated, "Obviously, the inventory buildup and the associated costs with that, offsite storage, additional labor, increased transportation, those costs are in our margin, though those were flexed up given a rather extraordinary inventory levels we took to ensure supply." He continued:

> We've got some feedback from our stores. They were hearing that from customers as they were coming in, particularly with regards to our water tests. Even in a down quarter, we ran more water tests than the prior year's period, but the conversion of those tests was lower. And what we were

Verified Shareholder Derivative Complaint

hearing from the stores when we questioned it was that they were hearing that people had – already had those chemicals. So it's a highly unusual situation when we think of what the duration might be.

177.   On November 28, 2023 Leslie's issued a press release announcing its financial results for the fourth quarter of 2023. The press release reported that sales fell 9.1% compared to the fourth quarter of 2022 and comparable product sales fell 11.0% compared to the fourth quarter of 2022. The press release further reported that gross profit fell 26.3% compared to the fourth quarter of 2022 partly because of inventory-related expenses, including a bigger adjustment than anticipated that had to be taken after Leslie's year-end inventory count, and the expensing of capitalized distribution costs pertaining to reduction of inventory.

178.   During the November 28, 2023 conference call, Defendant Egeck conceded that "customer stockpiling" of chlorine-based products was still tamping-down demand for the Company's products.   Additionally, Leslie's new CFO, Scott Bowman, stated the following about the Company's gross margins and relation to inventory:

> [W]e incurred unexpected incremental inventory adjustment costs [that] resulted in a 260 basis point headwind in the quarter. This increase was mainly due to excess shrink and scrap [due to] higher levels of inventory and third-party storage locations, higher movement of goods between facilities and higher levels of [unsellable] returns.

179.   Bowman further revealed that Leslie's had a material weakness in internal controls over financial reporting relating "to controls over the performance of physical inventories[]. As a result, we are designing and implementing new processes [and] enhanced controls to address the underlying causes of the material weakness in fiscal 2024."

180.   During the call, an analyst from Morgan Stanley inquired about the Company's fourth quarter of 2023 inventory adjustment, asking Scott Bowman, [Y]ou said that the biggest gap in the guidance you gave was the inventory adjustments. Can you talk about why those were not observable in July? Scott Bowman replied:

> . . . The main reason is, as we kind of step back and look at the issue on inventory adjustments. The main issue, which is having too much inventory. We [peaked] close to $500 million, [then it] start[ed] to come down, but it's more inventory than we've had. In the past, I mean that required us to use several third party off-site storage facilities with a lot of movement of product between those facilities. We had some higher and sellable return[s]. So, it just created a lot of movement of goods [and] goods not in our – inside our four walls.

> And so, that is the root of the problem….

181.   On November 29, 2023, Leslie's filed its annual report for the 2023 Fiscal Year with the SEC (the "2023 10-K"). The 2023 10-K reported the Company's inventory adjustment and associated material weakness, stating the following:

> In connection with our year-end assessment of internal control over financial reporting as part of this Annual Report on Form 10-K, we determined that, as of September 30, 2023, we did not maintain effective internal control over financial reporting because of material weaknesses related to the design and/or operation of controls that were not performed at a sufficient level of precision with respect to (i) the performance of physical inventories and the validation of data utilized in inventory costing for a subset of our inventory .
> . . .

182.   Additionally, the 2023 10-K, in a section titled "Management's Report on Internal Control over Financial Reporting," further reported on the material weakness in the Company's internal controls:

> We identified a material weakness in the Company's internal control over financial reporting related to the operation of controls over the performance of a subset of the Company's physical inventories held at certain locations to validate inventory existence and the completeness and accuracy of data used

in validating the appropriateness of inventory costing for a subset of the Company's inventories and inventory reserves.

183.   Moreover, the 2023 10-K explained the Individual Defendants plans to remedy the Company's material weakness in internal controls over financial reporting in respect to inventory management, including: "[E]nhancement of the procedures over certain of our annual physical inventory counts, including the augmentation of training and validation of system generated reports utilized in performing certain annual physical counts and clear instruction as to the process for the recording of adjustments to inventory as a result of physical counts and validation of data used in inventory costing" and "examination and enhancement of the procedures over the completeness and accuracy of data utilized in computing inventory reserves."

## REPURCHASES DURING THE RELEVANT PERIOD

184.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $151 million to repurchase approximately 7.5 million shares of its own common stock at artificially inflated prices in December 2022.

185.   According to the Company's Form 10-Q filed with the SEC on July 1, 2023, the Company repurchased 7.5 million shares of its own common stock at an average price per share of $20.25, for a total cost to the Company of approximately $151 million in December 2022.

186.   As the Company's stock was actually worth only $5.46 per share, the price at closing on July 17, 2023, the Company overpaid by approximately $111 million for repurchases of its own stock in December 2022.

187.   Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $111 million.

### DAMAGES TO LESLIE'S

188.   As a direct and proximate result of the Individual Defendants' conduct, Leslie's has lost and expended, and will continue to lose and expend, many millions of dollars.

189.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

190.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

191.   Such losses include the Company's overpayment of nearly $111 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to Defendants' false and misleading statements discussed above.

192.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any

investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

193.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

194.   As a direct and proximate result of the Individual Defendants' conduct, Leslie's has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

195.   Plaintiff brings this action derivatively and for the benefit of Leslie's to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Leslie's, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 20(a), 10(b) (and Rule 10b-5 promulgated thereunder), and 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

196.   Leslie's is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.   Plaintiff is, and has been at all relevant times, a shareholder of Leslie's. Plaintiff will adequately and fairly represent the interests of Leslie's in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

198.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

199.   A pre-suit demand on the Board of Leslie's is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Egeck, Daniel, Kufel, Ortega, O'Farrell, Spofford, and Strain (the "Director Defendants"), and non-party Seth Estep (together with the Director Defendants, "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

200.   Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to overpay nearly $111 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to Defendants' false and misleading statements. Furthermore, while the price of the Company's stock was artificially inflated by their misconduct, three of the Director Defendants further breached their fiduciary duties by engaging in insider sales of the Company's common stock, which caused them to receive over $78,744,553 in proceeds, and which further demonstrates their motive for facilitating and participating in the scheme. All of the above renders the Director

Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

201.  In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Leslie's to issue materially false and misleading statements. Specifically, the Director Defendants caused Leslie's to issue false and misleading statements which were intended to make Leslie's appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

202.  Additional reasons that demand on Defendant Egeck is futile follow. Defendant Egeck currently serves as the Company's CEO and has served as the CEO and as a Company director since February 2020. As such, the Company provides Defendant Egeck with his principal occupation for which he receives lucrative compensation, including $7,911,515 in 2021 and $3,339,438 in 2022. Thus, as the Company admits, he is a non-independent director. As CEO throughout the Relevant Period, Defendant Egeck was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in SEC filings and his statements in press releases, earnings calls, and conferences wherein he personally made the false and misleading statements at issue. Moreover, Defendant Egeck solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board. As the Company's highest officer

and a trusted director, he conducted little, if any, oversight of the Company's engagement in the scheme and consciously disregarded his duties to protect corporate assets. Moreover, his insider sales made before the fraud was exposed yielded approximately $31,973,434 in proceeds and demonstrate his motive in facilitating and participating in the scheme. Furthermore, Defendant Egeck is a defendant in the Securities Class Action. For these reasons, too, Defendant Egeck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.   Additional reasons that demand on Defendant Ortega is futile follow. Defendant Ortega has served as the Chairman of the Board since 2020. He previously served as CEO and President from 2017 to 2020, COO and President from 2015 to 2017, CFO and COO from 2014 to 2015, and EVP and CFO from 2005 to 2015. As such, the Company provides Defendant Ortega with lucrative compensation, including $3,989,352 for the 2021 Fiscal Year and $500,185 for the 2022 Fiscal Year. Thus, as the Company admits, he is a non-independent director. As Chairman of the Board throughout the Relevant Period, Defendant Ortega was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in SEC filings and statements in press releases, earnings calls, and conferences. Moreover, Defendant Ortega solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to the re-election of Defendants Ray, Strain, Egeck, Daniel, and Kufel to the Board, who all were breaching their fiduciary duties to the Company. As the Chairman of the Board, he

conducted little, if any, oversight of the Company's engagement in the scheme and consciously disregarded his duties to protect corporate assets. Moreover, his insider sales made before the fraud was exposed yielded approximately $46,097,811 in proceeds and demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant Ortega breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204.   Additional reasons that demand on Defendant Daniel is futile follow. Defendant Daniel has served as a Company director since October. She also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Daniel received and continues to receive handsome compensation for her role as a director as noted above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Daniel solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Daniel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

205.   Additional reasons that demand on Defendant Kufel is futile follow. Defendant Kufel has served as a Company director since January 2018. Defendant Kufel

received and continues to receive handsome compensation for his role as a director, including $456,099 in 2021 and $237,202 in 2022. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kufel solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. Additionally, his insider sales made before the fraud was exposed yielded approximately $673,308 in proceeds and demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant Kufel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.   Additional reasons that demand on Defendant O'Farrell is futile follow. Defendant O'Farrell has served as a Company director since October 2020. She also serves as Chair of the Audit Committee. Defendant O'Farrell received and continues to receive handsome compensation for her role as a director, including $202,917 in 2021 and $268,735 in 2022. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant O'Farrell solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to the re-election of Defendants

Ray, Strain, Egeck, Daniel, and Kufel to the Board, who all were breaching their fiduciary duties to the Company. For these reasons, too, Defendant O'Farrell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Spofford is futile follow. Defendant Spofford has served as a Company director since May 2022 and serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Spofford received and continues to receive compensation for her role as a director as noted above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Spofford solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions, and contributed to the re-election of Defendants Ray and Strain to the Board, both of whom were breaching their fiduciary duties to the Company as alleged above. For these reasons, too, Defendant Spofford breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

208.    Additional reasons that demand on Defendant Strain is futile follow. Defendant Strain has served as a Company director since August 2018 and serves as Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Strain received and continues to receive handsome compensation for his role as a director,

including $217,917 in 2021 and $261,886 in 2022. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Strain solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. Additionally, his insider sales made before the fraud was exposed yielded approximately $673,308 in proceeds and demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant Strain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.   Additional reasons that demand on the Board is futile follow.

210.   As described above, Director Defendants Egeck, Ortega, and Kufel directly engaged in insider trading, in violation of federal law. While in possession of material non-public information, Defendant Egeck received proceeds in excess of $31,973,434, Defendant Ortega received proceeds in excess of $46,097,811, and Defendant Kufel received proceeds in excess $673,308, all as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to Director Defendants Egeck, Ortega, and Kufel, and further excused.

211.   Defendants O'Farrell (as Chair), Daniel, and Strain (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The

Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to making false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

212.   In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known

violations of the Code of Ethics and the law. Thus, the Director Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

213.   Leslie's has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Leslie's any part of the damages Leslie's suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

214.   The acts complained of herein constitute violations of fiduciary duties owed by Leslie's officers and directors, and these acts are incapable of ratification.

215.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

216.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Leslie's. If

there is a directors' and officers' liability insurance policy covering Company directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against Company directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Leslie's, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

217.   If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Leslie's to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

218.   Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

219.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.   Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

221.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

222.   Under the direction and watch of Defendants Ray, Strain, Ortega, Egeck, Magliacano, O'Farrell, Daniel, Kufel, Spofford, and Kozlak, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's customers purchased more pool chemicals than needed during and after the COVID-19 pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by artificial demand from a feared product shortage; (4) the Company concealed the true cause of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result, the Company's public statements depicting Leslie's growth as "durable," "show[ing] no signs of slowing," and being based upon

"healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls.

223.   Under the direction and watch of Defendants Ray, Strain, Ortega, Egeck, Magliacano, O'Farrell, Daniel, Kufel, Spofford, and Kozlak, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) the Individual Defendants were violating the Code of Ethics without obtaining waivers or else without such waivers being disclosed.

224.   In the exercise of reasonable care, Defendants Ray, Strain, Ortega, Egeck, Magliacano, O'Farrell, Daniel, Kufel, Spofford, and Kozlak knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The

misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of Defendants Ray and Strain as directors, the ratification of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year, and the approval, on a non-binding advisory basis, of named executive officer compensation.

225.    The false and misleading elements of the 2023 Proxy Statement led Company shareholders to, *inter alia,* (1) re-elect Defendants Ray and Strain to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, named executive officer compensation.

226.    The Company was damaged as a result of Defendants Ray, Strain, Ortega, Egeck, Magliacano, O'Farrell, Daniel, Kufel, Spofford, and Kozlak's material misrepresentations and omissions in the 2023 Proxy Statements.

227.    Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.    The Individual Defendants, by virtue of their positions with Leslie's and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Leslie's

and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Leslie's to engage in the illegal conduct and practices complained herein.

230.     Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

231.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Leslie's. Not only is Leslie's now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Leslie's by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Leslie's.

233.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

234.   The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Leslie's not misleading.

235.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Leslie's.

236.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

237.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

238.   Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FOURTH CLAIM**

### **Against Individual Defendants for Breach of Fiduciary Duties**

239.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Leslie's business and affairs.

241.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

242.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Leslie's.

243.   In breach of their fiduciary duties owed to Leslie's, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Leslie's customers feared a pool chemical product shortage due in part to a chemical-availability warning letter sent by the Company; (2) Leslie's customers purchased more pool chemicals than needed during and after the COVID-19 pandemic at inflated rates; (3) as a result, Leslie's product sales growth was caused by artificial demand from a feared product shortage; (4) the Company concealed the true cause of its growth by telling investors Leslie's spurred the growth organically from its corporate efforts; (5) as a result,

the Company's public statements depicting Leslie's growth as "durable," "show[ing] no signs of slowing," and being based upon "healthy ongoing consumer demand," were materially false and misleading at the time they were made; (6) as a further result of the foregoing, the Company's chlorine-based product inventory at certain retail stores and distribution centers exceeded capacity, forcing stores to become warehouses, with some stores even storing chlorine inventory outside for want of storage space; (7) as a further result, stores and distribution centers were subject to a heightened fire risk due to housing excess amounts of flammable chlorine in small spaces; (8) as a further result, store managers resorted to personally moving inventory from store to store to manage the excess inventory; (9) the Company was compelled to hire third party chemical storage companies to hold excess inventory during the 2022 and 2023 Fiscal Years; and (10) the Company failed to maintain adequate internal controls.

244.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

245.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

246.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

247.    In yet further breach of their fiduciary duties, during the Relevant Period, Defendants Ortega, Egeck, Waddell, and Kufel engaged in numerous insider sales, netting

proceeds of approximately $95,039,203, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

248.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

249.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

250.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Leslie's has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.   Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

<u>**FIFTH CLAIM**</u>

**Against Individual Defendants for Unjust Enrichment**

253.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Leslie's.

255.   The Individual Defendants either benefitted financially from the improper conduct and their making insider sales, or received profits, bonuses, stock options, or similar compensation from Leslie's that was tied to the performance or artificially inflated valuation of Leslie's, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

256.   Plaintiff, as a shareholder and representative of Leslie's, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any

performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

257.  Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

258.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.  As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

260.  In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

261.  As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

262.  Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Abuse of Control

263.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

264.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Leslie's, for which they are legally responsible.

265.   As a direct and proximate result of the Individual Defendants' abuse of control, Leslie's has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.   Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

### EIGHTH CLAIM

**Against Individual Defendants for Gross Mismanagement**

267.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Leslie's in a manner consistent with the operations of a publicly held corporation.

269.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Leslie's has sustained and will continue to sustain significant damages.

270.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

271.   Plaintiff, on behalf of Leslie's, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Egeck and Weddell for Contribution Under Sections 10(b) and 21D of the Exchange Act

272.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

273.   Leslie's and Defendants Egeck and Weddell are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Egeck's and Weddell's willful and/or reckless violations of their obligations as officers and/or directors of Leslie's.

274.   Defendants Egeck and Weddell, because of their positions of control and authority as officers and/or directors of Leslie's, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Leslie's, including the wrongful acts complained of herein and in the Securities Class Action.

275.   Accordingly, Defendants Egeck and Weddell are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

276.   As such, Leslie's is entitled to receive all appropriate contribution or indemnification from Defendants Egeck and Weddell.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Leslie's, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Leslie's;

(c)    Determining and awarding to Leslie's the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Leslie's and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Leslie's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Leslie's to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of

Verified Shareholder Derivative Complaint

1    compliance with applicable laws, rules, and regulations.

2        (e)    Awarding Leslie's restitution from Individual Defendants, and each

3    of them;

4

5        (f)    Awarding Plaintiff the costs and disbursements of this action,

6    including reasonable attorneys' and experts' fees, costs, and expenses; and

7        (g)    Granting such other and further relief as the Court may deem just and

8    proper.

9

10                            **JURY DEMAND**

11   Plaintiff hereby demands a trial by jury.

12       Respectfully submitted this 12th day of March, 2024

13

14                            **MARTIN & BONNETT PLLC**

15                            /s/ *Jennifer Kroll*
                             Jennifer Kroll
16                            4647 N. 32nd Street, Suite 185
                             Phoenix, AZ 85018
17                            Telephone: (602) 240-6900
                             Facsimile: (602) 240-2345
18                            Email: jkroll@martinbonnett.com
19

20                            **THE BROWN LAW FIRM, P.C.**
                             Timothy Brown (*pro hac vice* app. forthcoming)
21                            767 Third Avenue, Suite 2501
                             New York, NY 10017
22                            Telephone: (516) 922-5427
                             Facsimile: (516) 344-6204
23                            Email: tbrown@thebrownlawfirm.net
24

25                            **BRONSTEIN, GEWIRTZ & GROSSMAN,**
                             **LLC**
26                            Peretz Bronstein (*pro hac vice* app.
                             forthcoming)
27                            Eitan Kimelman (*pro hac vice* app.
28

99
Verified Shareholder Derivative Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com

Verified Shareholder Derivative Complaint